UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
RICKY JOSHUA BENNY,

              PLAINTIFF,

     -against-

THE CITY OF LONG BEACH, THE LONG
BEACH POLICE DEPARTMENT, POLICE
OFFICER JOSEPH WIEMANN, POLICE
OFFICER ROCCO WALSH and OFFICERS
JOHN DOES 1-10,

          Defendants.
---------------------------------X

**MEMORANDUM AND ORDER**

20-CV-1908 (KAM)(ST)

**MATSUMOTO, United States District Judge:**

      On April 24, 2020, Plaintiff Ricky Joshua Benny ("Mr. Benny") filed a complaint against the City of Long Beach ("City"), the Long Beach Police Department ("LBPD"), and individual Defendants Police Officer Joseph Wiemann, Police Officer Rocco Walsh, and Officers John Does 1-10 (collectively, "Defendants") pursuant to 42 U.S.C. §§ 1981 and 1983, alleging violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, and New York law.  (ECF No. 1, Complaint ("Compl.").)  On September 23, 2021, this Court dismissed the City of Long Beach and the Long Beach Police Department as defendants, as well as the § 1981 claim.  Mr. Benny's claims of false arrest, malicious prosecution, abuse of process, fabrication of evidence, excessive force, failure to intervene, racial discrimination, and a deprivation of his First Amendment

1

right to free speech remain.  (See *id*. ¶¶ 15, 18, 23, 32, 36, 104.)

Defendants now seek summary judgment, asserting that they are entitled to judgment on the remaining claims, and alternatively, that they are entitled to qualified immunity for acting as reasonable police officers when arresting and using force against Mr. Benny, and allegedly causing physical injuries.  Mr. Benny counters that he should not have been arrested, subjected to excessive force and ongoing abuses of process, which he contends were due to his race and his video recordings of Defendants on the night of his arrest.  This Court has reviewed three videos that Defendants and Mr. Benny have submitted of the circumstances leading to, and during, Mr. Benny's arrest on December 8, 2018.

For the reasons set forth below, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

I.   **FACTUAL BACKGROUND**

A.  The Parties' Submissions

Defendants filed a statement of material facts that purportedly are not in dispute, pursuant to Local Civil Rule 56.1.  (ECF No. 44-7, Defs. Rule 56.1 Statement.)  Defendants' "statement of material facts . . . required to be served by the

moving party will be deemed to be admitted for the purposes of
the motion unless specifically controverted by a correspondingly
numbered paragraph in the statement required to be served by the
opposing party" pursuant to Local Civil Rule 56.1(c).
Defendants support their 56.1 Statement with admissible
evidence, but do not provide any affidavits or declarations from
the Defendant officers themselves.  Mr. Benny filed the required
counter statement and declarations of himself and his counsel,
deposition excerpts and other exhibits in opposition to
Defendants' motion for summary judgment.  (ECF No. 45-1, Pl.
Rule 56.1 Counter Statement; ECF. No. 45-2, Pl. Decl. in Opp'n.)

        In support of their summary judgment motion, along
with their Rule 56.1 Statement and exhibits, which this Court
recounts for completeness, the Defendants also provide three
video recordings which the parties agree depict the incident on
December 8, 2018, taken by others with Mr. Benny.  (ECF No. 44-
3, Defs. Mot. for Summ. J., Exhibit A – C (individually "Exhibit
A", "Exhibit B", and "Exhibit C").)  Defendants' counsel, Mr.
Howard Miller ("Mr. Miller"), filed an affirmation to which he
annexed three video exhibits, and designated the Exhibits as
follows: Exhibit A is "a copy of a video recording that was
provided to me by Mr. Benny's counsel," Exhibits B and C are
"two additional videos provided to me by the Corporation Counsel
of the City of Long Beach that show the incident recorded in

Exhibit 'A' from slightly different angles," and Exhibit D contains "exhibits of Mr. Benny's examination pursuant to Section 50-h of the General Municipal Law."  (ECF No. 44-2, Affirmation of Howard Miller, Esq., ¶¶ 2-4 ("Miller Aff.").) Defendants' counsel, Mr. Richard Finkel ("Mr. Finkel"), also filed an affirmation to which he annexed Exhibit "E," described as "a copy of the portion of Mr. Benny's 50-h transcript cited in Defendants' Reply Memorandum of Law."  (ECF No. 46-2, Affirmation of Richard Finkel, Esq. ("Finkel Aff.) at ¶¶ 2, 3.)

         In opposition to Defendant's motion, Mr. Benny's counsel, Mr. Frederick Brewington ("Mr. Brewington") submitted a declaration, identifying video Exhibit A[1] as a video that Mr. Benny provided to him, which Mr. Brewington then provided to defense counsel.  (ECF No. 45-3, Declaration of Frederick Brewington, Esq. in Opposition to Defs. Mot. for Summ. J. ("Brewington Decl. in Opp'n.") at ¶ 3.)  Mr. Brewington states the Exhibit A video "contains the fullest depictions of the events giving rise to Mr. Benny's claims" and is a "true and accurate recording of Mr. Benny's arrest."  (*Id*. at ¶¶ 4-7.) Mr. Brewington also submitted photos of Mr. Benny following his release by the police, medical records pertaining to Mr. Benny's

---

[1] The videos identified as Exhibit A to the Brewington Declaration and as Exhibit A to the Miller Affirmation are identical, though Mr. Brewington labeled the actual video file, "File 1," in Plaintiff's submissions to the Court.  The Court will refer to the video as Exhibit A.

injuries and treatment rendered following his release, the
decision and order from the Hon. William Miller, Long Beach City
Court Judge, and the accusatory instruments Defendants filed
against Mr. Benny.  (*Id.* at ¶¶ 7-11.)

In reviewing the parties' Rule 56.1 statements, the
Court has considered and relies on the undisputed facts, and the
three video recordings which the parties agree depict the
December 8, 2018 incident giving rise to the action.  Because
this Court relies on the video evidence in deciding Defendants'
instant motion, the Court will also recount the videos for
completeness, including portions that contradict the parties'
accounts of the night.  Where facts, even with the available
video evidence, are in dispute, the Court considers the facts in
the light most favorable to Mr. Benny, the nonmoving party,
while resolving all reasonable inferences and ambiguities
against the moving party.  *See Flanigan v. Gen. Elec. Co.*, 242
F.3d 78, 83 (2d Cir. 2001).  The Court also considers if the
disputed fact is supported by admissible evidence and is
material.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 586 (1986).

B.  The Incident of December 8, 2018

On December 8, 2018, at approximately 3:00 to 3:30
a.m., Mr. Benny, a 25-year-old African-American and Hispanic-
American male, was involved in an incident with the individual

LBPD Defendants outside an establishment known as Whale's Tale located in Long Beach, New York.[2]  Mr. Benny was with a group of his friends outside of Whale's Tale after employees instructed all parties to leave the premises.  (*See* Defs. Rule 56.1 Statement, ¶¶ 1-2; *see also* Pl. Rule 56.1 Statement, ¶¶ 1-2.) The individual LBPD Defendants were at the scene because of a fight.  (*See* Defs. Rule 56.1 Statement, ¶ 3; *see also* Pl. Rule 56.1 Counter Statement, ¶ 2.)  In Mr. Benny's account of the night, the disturbance reportedly involved "Caucasian persons" who were fighting; Mr. Benny alleges that those Caucasian persons were confronted by the police but were permitted to leave without charges.  (Pl. Rule 56.1 Counter Statement, ¶ 6.)

　　　As Mr. Benny and his friends, including Cedric Coad ("Mr. Coad") and Rashawn Weed ("Mr. Weed"), also African-American males, proceeded down the street and waited for their ride-share car service, the three men and the officers engaged with each other.  (*See Id.* at ¶ 3; ECF. No. 45-2, Pl. Decl. in Opp'n. at ¶¶ 2-5; *see also* Defs. Rule 56.1 Statement, ¶ 2-3.) Mr. Benny states that he was approached by the officers as he,

---

[2] Defendants' Rule 56.1 Statement alleged Mr. Benny was 27 years old and that the incident occurred on December 18, 2018.  Mr. Benny's Rule 56.1 Counter Statement clarifies he was 27 years old at the time of the filing of his Complaint—roughly a year and a half after the police encounter here—and that the incident occurred on December 8, 2018, not December 18, 2018.  Mr. Benny also clarifies the establishment's name was Whale's Tale, and not Wales and Tales.  (Pl. Rule 56.1 Counter Statement, ¶¶ 1-2.  These minor disputed facts are not material for purposes of deciding Defendants' motion for summary judgment.

Mr. Coad, and Mr. Weed proceeded down the street, whereas Defendants assert that Mr. Benny first approached the officers as they were in the process of arresting an individual.  (*See* Pl. Rule 56.1 Counter Statement, ¶ 3; *see also* Defs. Rule 56.1 Statement, ¶ 3.)  Mr. Benny claims that the police had first focused on Mr. Coad, because Mr. Coad had raised his hands as protestors had done during the Black Lives Matter movement, and this "seemed to enrage the officers," who then "approached Mr. Coad, grabbed him from behind, and forcefully body slammed [Mr. Coad] to the ground."  (Pl. Rule 56.1 Counter Statement, ¶ 4; Pl. Decl. in Opp'n. at ¶¶ 5-6.)

The Defendants began to place Mr. Coad under arrest, with some of the officers surrounding Mr. Coad and others keeping bystanders, like Mr. Benny and Mr. Weed, at a distance from where Mr. Coad's arrest was occurring.  (Pl. Rule 56.1 Counter Statement, ¶ 4-5.)  Mr. Coad made no effort to resist the officers and remained on the ground as officers placed handcuffs on him.[3]  (Pl. Decl. in Opp'n. at ¶¶ 6-8.)  It is undisputed that Mr. Benny repeatedly inquired of the officers why they were arresting Mr. Coad and recorded the encounter on his cellphone.  (Pl. Rule 56.1 Counter Statement at ¶¶ 5-10.)

---

[3] Mr. Benny's sworn 50-h hearing testimony states that when he started recording, the police "[told] everybody to give them space," and "not to be so close" to where the officers were arresting Mr. Coad.  (Miller Aff., Exhibit D at 20-21.)

The officers did not respond to Mr. Benny's inquiries regarding Mr. Coad's arrest. (*Id.*) Instead, they instructed Mr. Benny to leave the area and "back up" across the street. (*See* Pl. Rule 56.1 Counter Statement, ¶ 6; *see also* Defs. Rule 56.1 Statement, ¶ 4.)

Mr. Benny declares that the officers told him to back up and he complied, eventually standing on the sidewalk across the street from Mr. Coad's arrest. (Pl. Decl. in Opp'n. at ¶ 7.) Mr. Benny asked the officers why he and his friends were being treated differently from the people engaged in the fight, as they "all grew up in the Long Beach community," to which an officer responded "yea, we all did, now back up." (*Id.* at ¶ 8.) Mr. Benny was directed to the opposite side of the street from where Mr. Coad had been arrested and stood approximately twenty feet away. (*Id.* at ¶ 9.) Mr. Benny declares that he was "physically shoved backward by police" when he stepped off the sidewalk, so he stepped back onto the sidewalk, but continued to demand their names and badge numbers. (*Id.* at ¶¶ 10-11.)

Mr. Benny acknowledges that during this encounter, he repeatedly yelled at the officers to request their badge numbers and asked for an explanation for Mr. Coad's arrest. (*See* Pl. Rule 56.1 Counter Statement, ¶¶ 5,8,9; Pl. Decl. in Opp'n. at ¶ 9; *see also* Defs. Rule 56.1 Statement, ¶ 5.) It is undisputed that as Mr. Benny and other bystanders continued to inquire and

8

record with their cellphones, an officer gave Mr. Benny a "final warning" to leave the area. (*See* Pl. Rule 56.1 Counter Statement, ¶ 6; *see also* Defs. Rule 56.1 Statement, ¶ 6.) Mr. Benny, however, denies that he refused to leave the area and asserts that the "final warning" was "unlawful" because it followed his repeated requests for identifying information from the officers. (*See* Pl. Rule 56.1 Counter Statement, ¶ 6.) Mr. Benny also denies disregarding any order including a "final warning," or that he refused to leave the area. (Pl. Rule 56.1 Counter Statement, ¶ 7.)

Mr. Benny was placed under arrest and charged with obstructing governmental administration, disorderly conduct, and resisting arrest. (*See* Pl. Rule 56.1 Counter Statement, ¶ 9; *see also* Defs. Rule 56.1 Statement, ¶¶ 8-9.) Defendants state that after Mr. Benny disregarded a final warning, "the police officers attempted to arrest him." (Defs. Rule 56.1 Statement at ¶ 8.) They characterize Mr. Benny's actions as resisting arrest, as he "caus[ed] a brief struggle on the ground before his arrest [sic]." (*Id.* at ¶ 9.)

Mr. Benny disputes the account of his arrest and says that he was "told he was under arrest and ordered to turn around" but "before [he] could comply," he was "grabbed from behind, picked up in a bear-hug and viciously slammed to the ground" by an officer he cannot identify. (Pl. Decl. in Opp'n.

at ¶ 13; Pl. Rule 56.1 Counter Statement, ¶ 11.)  Mr. Benny contends that he was not given sufficient time to submit to the arrest before the officer's initial physical contact with him. He declares that he did not know who grabbed him and that he "reflexively attempted" to stand up and was immediately "body slammed" again.  (Pl. Decl. in Opp'n. at ¶ 13.)  Although Defendants contend that Mr. Benny resisted arrest, Mr. Benny denies that he provided any resistance or "caus[ed] a brief struggle on the ground before his arrest"; instead, Mr. Benny declares that he was "knocked unconscious for brief period of time."  (*See* Pl. Rule 56.1 Counter Statement, ¶ 11-12; *see also* Defs. Rule 56.1 Statement, ¶ 9.)  Mr. Benny also asserts that he "never pushed, shoved or hit any police officer."  (Pl. Rule 56.1 Counter Statement at ¶ 12.)

Mr. Benny declares that, since, and because of, his arrest by Defendants, he has experienced significant "mental and physical injuries."  (*Id.* at ¶¶ 15-20; Pl. Decl. in Opp'n. at ¶¶ 16-20.)  Mr. Benny submitted photographs showing cuts and abrasions on his head and face and medical records that he allegedly sustained during the incident.  (Brewington Decl. in Opp'n., Exhibits B and C.)  Mr. Benny further alleges his arrest impacted his career as a musical artist by compelling him to cancel a scheduled performance and rendering him "unable to make music for over a year."  (Pl. Decl. in Opp'n. at ¶ 22.)

Mr. Benny states he wants the Defendants "to address the clear difference in their treatment of [Mr. Benny and his friends], who had done nothing wrong, and the White people who were actually in the fight."  (*Id.* at ¶ 23.)

### A. *Video Exhibits*

The parties agree that Exhibit A, which is approximately three minutes and fifty-three seconds long, is "the fullest depiction of the events giving rise to Mr. Benny's claims." (Brewington Decl. in Opp'n. at ¶ 4; *see generally* Exhibit A.)  Exhibit B and Exhibit C, provided by Defendants' counsel, "show the incident recorded in Exhibit 'A' from slightly different angles."  (Miller Aff. at ¶ 2.)  Exhibit B, which is approximately two minutes and three seconds long, shows a different angle of the physical interactions between Mr. Benny and Defendants after he is told he is under arrest.  (*See generally* Exhibit B.)  Exhibit C, which is approximately forty-two seconds long, shows the multiple bystanders and officers at the scene, the distance between where the Defendants are effecting the arrest of Mr. Coad and the bystanders, and ends as Mr. Benny reapproaches the officers.  (*See generally* Exhibit C.) The Court will primarily recount Exhibit A and portions of Exhibit B for background on Mr. Benny's arrest.

The first minute of Exhibit A shows that the Defendants, to secure the area in which multiple bystanders had

gathered, repeatedly ask Mr. Benny and other bystanders to "back up" and "clear the area."[4]  (Exhibit A, 00:00-00:58.)  Exhibit A starts with a Defendant officer telling Mr. Benny and the bystanders, including the individual recording Exhibit A, "He's under arrest and that's it."[5]  (*Id.* at 00:00-00:04.)  The individual recording video Exhibit A says, "For what? For what? He didn't do nothing.  He was walking away."  (*Id.* at 00:04-00:07.)  At least one Defendant officer responds with "back up, back up," including, "back up across the street."  (*Id.* at 00:07-00:28.)  The individual recording the video responds, "I'm backing up, I'm backing up" while others, including Mr. Benny, though it is not clear as Mr. Benny is off camera in the recording at this time, also ask, "For what? For what?"  (*Id.*) The Defendant officer continues to instruct the bystanders to move back while saying, "let's go, gentlemen," and "sir, back up across the street" and then, "thank you, thank you," because the men appear to be moving backward.  (*Id.*)

Mr. Benny, then, clearly appears in the video to reapproach the Defendants and says, "we all grew up over here…" to which an individual Defendant officer responds, "we all did." (*Id.* at 00:27-00:33.)  Mr. Benny responds, "Exactly, exactly—so

---

[4] In Exhibit A, various individual Defendants direct Mr. Benny and others to "back up" at least ten times before Mr. Benny ultimately is told he is under arrest.  (Exhibit A, 00:00-00:58.)
[5] The officers are presumably talking about Mr. Coad.

why-then why you feel differently?"[6]  (*Id.*)  Mr. Benny again
walks into the street toward the officers, where the Defendants
had just asked everyone to "back up," and walks directly up to a
Defendant officer.  (*Id.* at 00:33-00:40.)  Mr. Benny says to the
Defendant officer, who continues to instruct him to move back,
"you're touching me, I'm not touching you," and the Defendant
officer responds, "I can touch you," as he walks away.  (*Id.* at
00:40-00:42).  Mr. Benny then reapproaches the Defendant
officer, once again, and says, "Exactly, you're touching me."
(*Id.*)  At this point, the Defendant officer uses his hand to
push Mr. Benny back and another officer swiftly approaches Mr.
Benny and yells, "Stay on the sidewalk."  (*Id.* at 00:42-00:46).
Mr. Benny, then, increases the volume of his voice, and the
verbal exchange between Mr. Benny and the Defendants begin to
overlap.

Defendants stand in front of Mr. Benny and direct the
onlookers, including Mr. Benny, to "clear the area right now" no
less than seven times with Mr. Benny repeatedly refusing and
responding, "no, I have the right."  (*Id.* at 00:46-01:06.)
During this time, one of Mr. Benny's friends tells Mr. Benny
"come on" in an apparent attempt to get Mr. Benny to comply and
step away, and Mr. Benny also responds "no" to his companion.

---

[6] In their motion papers, the parties do not identify who any of the
individuals are in the Exhibits.  The Court will presume that Mr. Benny is
the individual in the green toned jacket.

(*Id.*)  When Defendants thereafter state, at least three times, that this is the "last warning" to "clear the area" and that Mr. Benny is "acting disorderly," Mr. Benny responds with several "no"s and "I'm not, though." (*Id.* at 01:06-01:10.)  It is during this last moment of Mr. Benny's noncompliance with Defendants' orders that Defendants advise Mr. Benny that he is under arrest. (*Id.* at 01:13.)  Exhibit B and Exhibit C also show that Mr. Benny defied repeated orders to step back and clear the area while continuing to yell at the Defendants who were attempting to effect an arrest and control the crowd. (Exhibit B, 00:01-00:13; Exhibit C, 00:12-00:25.)

The actions of Mr. Benny and the Defendant officers in the seconds leading up to Mr. Benny's actual arrest are not clearly discernable in video Exhibits A through C.  The camera in Exhibit A is pointed at a Defendant officer who informs Mr. Benny that he is under arrest and directs him to turn around. (Exhibit at 01:14-01:15.)  The camera does not show Mr. Benny, so it is unclear what Mr. Benny was doing in response, or how close Mr. Benny was to the officer. (*Id.*)  Approximately one second after the Defendant officer informed Mr. Benny he was under arrest and directed him to turn around, the camera shows that either the same officer or another officer (it is not clear in any of the videos) wraps his arms around Mr. Benny and attempts to physically place him under arrest. (*Id.* at 01:15-

14

01:16.)  In Exhibit B, the video recording also does not capture what happens between the time when a Defendant officer tells Mr. Benny he is under arrest and when an officer physically attempts to arrest him.  (Exhibit B, 00:13-00:19.)

When the camera in Exhibit A's video is pointed at Mr. Benny again, it shows Mr. Benny's hands and knees momentarily make contact with the ground after the Defendant officer's initial attempt to physically arrest him.  (Exhibit A, 01:17-01:18.)  Mr. Benny then to spins and breaks free of the officer's grasp.  (*Id.*)  Then Mr. Benny quickly stands and at least two officers scuffle with Mr. Benny before they attempt and successfully bring Mr. Benny's body onto the ground.  (*Id.* at 01:19-01:26.)  The amount of force used to bring Mr. Benny to the ground is not clear from the video in Exhibit A.

In Exhibit B, the video recording's camera angle confirms that Mr. Benny spins and breaks free of the Defendant officer's initial attempt to effect Mr. Benny's arrest before Mr. Benny's knees momentarily make contact with the ground and he stands up.  (Exhibit B, 00:17-00:21.)  At this time, other voices can be heard saying "chill," although it is not clear who the statements are directed to and who is making the statements.  (*Id.* at 00:21-00:28.)  Exhibit B also shows that Mr. Benny and the officers scuffle for seconds as they push one another, until the officers bring Mr. Benny to the ground face down.  (*Id.*)

Once Mr. Benny is on the ground, at least two officers are holding him down, while his hands are placed behind his back, while the officers attempt to handcuff him.  (Exhibit A, 01:26-01:48.)  While Mr. Benny's face and body are fully on the sidewalk, a Defendant officer has his knee on Mr. Benny's left cheek for approximately twenty seconds, but the amount of weight applied by the officer to Mr. Benny's cheek is not clear.[7]  (*Id*.) For approximately twenty seconds, while the officers attempt to handcuff Mr. Benny, other bystanders ask "why are you on his face" until a Defendant officer moves his knee to Mr. Benny's back.  (*Id*.)  Another Defendant officer asks the individual recording the video to "back up" while the individual yells that the Defendants should not have had a knee on Mr. Benny's face. (*Id*. at 01:48-02:18.)

The rest of the Exhibit A video, after the Defendants have placed Mr. Benny in handcuffs, is not clear.  The individual recording the Exhibit A video backs away from the Defendants effecting Mr. Benny's arrest as a Defendant officer directs his flashlight in the direction of the individual.  (*Id*. at 02:20-02:29.)  The individual recording the video asks Mr. Benny for his phone code, and Mr. Benny intermittently responds from the ground.  (*Id*. at 02:21—03:20.)  As Mr. Benny is taken

---

[7] It is unclear to the Court from the video which officer has his knee on Mr. Benny's cheek and whether it is the same officer who initially attempted to restrain Mr. Benny with his arms.

to the police car, another bystander is heard saying, "he didn't do nothing" and "please" to the Defendants as another voice, apparently from Mr. Benny's direction, urges this person to "relax." (*Id.* at 03:21—03:53.)

## II.   PROCEDURAL BACKGROUND

Mr. Benny commenced this action on April 24, 2020 and filed proof of service on the Defendants.   (*See generally*, ECF No. 1, Compl.; ECF Nos. 8, 10.)   On July 10, 2020, Defendants' counsel filed a letter with the Court seeking a pre-motion conference to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Court's individual motion practices.   (ECF No. 13, Defs. Letter.)

On September 4, 2020, Defendants served a motion to dismiss pursuant to Rule 12(b)(6).   Defendants moved to dismiss on the following bases: (1) the Long Beach Police Department is not a proper defendant, (2) Mr. Benny's Section 1981 claim is subsumed by his Section 1983 claims, (3) the Complaint fails to adequately plead a *Monell* claim, (4) the Complaint fails to state a claim for excessive force and failure to intervene, (5) the Complaint fails to state claims for false arrest, malicious prosecution, and abuse of process claims, (6) the race discrimination claim should be dismissed for failure to state a claim, (7) the Complaint fails to state a claim under the First Amendment, and (8) Mr. Benny's requests for punitive damages

17

against the city are not viable.  (ECF No. 24, Defs. Mot. to

Dismiss.)  In Defendants' moving submission for their motion to

dismiss, Mr. Miller filed, an affirmation, identical to the

affirmation he filed for the instant summary judgment, to which

he annexed three video Exhibits and represented each as follows:

Exhibit A is "a copy of a video recording that was provided to

me by Mr. Benny's counsel that is referenced in paragraph '31'

of the Complaint," and Exhibits B and C are "two additional

videos provided to me by the Corporation Counsel of the City of

Long Beach that show the incident recorded in Exhibit 'A' from

slightly different angles."  (ECF No. 23, Affirmation of Howard

Miller for Defs. Mot. to Dismiss, at ¶¶ 2, 3.)

        Mr. Benny filed a memorandum in opposition to the

motion to dismiss on October 19, 2020, along with a declaration

from Mr. Brewington.  (*See* ECF No. 25, Brewington Decl. in

Opp'n. to Mot. to Dismiss); *see also* ECF No. 26, Pl. Opp'n. to

Mot. to Dismiss.)  Mr. Brewington's declaration stated that Mr.

Benny agreed: (1) the Long Beach Police Department was not a

proper defendant, (2) that all Mr. Benny's Section 1981 claims

were subsumed by his section 1983 claims, and (3) punitive

damages are unavailable against the City.[8]  (Brewington Decl. in Opp'n. to Mot. to Dismiss, ¶ 8.)

Given Mr. Benny's agreement that certain of his claims were not viable, the Court considered those claims withdrawn, and accordingly 1) dismissed the Long Beach Police Department as a defendant, 2) dismissed Mr. Benny's Section 1981 claims, and 3) to the extent Mr. Benny sought punitive damages against the City of Long Beach, the requested relief was denied and stricken.  (*See* Defs. Mot. to Dismiss; *see also* ECF No. 38, Memorandum and Order on Defs. Mot. to Dismiss at 13.)  The Court considered only Mr. Benny's remaining claims.  (*Id.*)

The Court granted in part and denied in part Defendants' motion to dismiss.  (Memorandum and Order on Defs. Mot. to Dismiss at 32-33.)  The Court dismissed Mr. Benny's Fifth Count, the claim for municipal liability against the City of Long Beach pursuant to Section 1983, for failure to state a claim.  (*Id.*)  The Court denied without prejudice Defendants' motion to dismiss Mr. Benny's excessive force, failure to intervene, false arrest, malicious prosecution, abuse of

---

[8] The Court notes that in Mr. Benny's motion to dismiss briefing, Mr. Benny did not defend against, and instead conceded, Defendants' arguments regarding his claims against the LBPD, claims pursuant to § 1981, and any claim for punitive damages against the City, and thus the Court considered those claims to be abandoned and dismissed them.  (ECF No. 38); *see e.g.*, *Jennings v. Hunt Companies*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (dismissing claims where plaintiff acknowledged the issues could not survive and mounted no defense of them).

process, race discrimination, and First Amendment claims, with leave to file a motion for summary judgment. (*Id.*)

The Court's opinion deciding Defendants' motion to dismiss described the unproductive and drawn-out process in which Mr. Benny's counsel and Mr. Benny failed to clarify which video Mr. Brewington relied on in drafting his complaint and noted that consequently the video evidence could not be considered in a motion pursuant to Rule 12(b)(6). Because the Court further noted that any "available, uncontested video evidence of the events that gave rise to the action" could be considered in a motion for summary judgment (*id.* at 31), the Court granted leave to the parties to move for summary judgment pursuant to Federal Rules of Civil Procedure 56 on the remaining, undismissed claims. (*Id.*) In considering a motion for summary judgment, the Court stated it would review the video evidence previously submitted by the parties, along with any other relevant, admissible evidence either party submitted into the record. (*Id.* at 32.) The Court notes that no new video was ever provided by Mr. Brewington, but the parties have nonetheless consented to the Court considering the three videos designated Exhibits A through C in support of the Defendants' motion for summary judgment and the evidence in their respective filings in support of, or in opposition to, summary judgment.

On November 9, 2021, pursuant to Federal Rules of Civil Procedure 56, Defendants filed a motion for summary judgment to dismiss Mr. Benny's remaining claims.  (*See generally*, ECF No. 44-1, Defs. Mot. for Summ. J.)  Defendants move for summary judgment on the following bases: (1) the undisputed evidence demonstrates there was no excessive force or failure to intervene, and if the excessive force claim survives summary judgment, Defendants are entitled to qualified immunity (Counts III and VI); (2) the false arrest, malicious prosecution, and abuse of process claims should be dismissed because the video evidence establishes the existence of probable cause to arrest and prosecute Mr. Benny (Count III and IV); (3) the Equal Protection claim based on race discrimination should be dismissed because the evidence is insufficient for a jury to find that officers acted with racial animus (Count II); and (4) the First Amendment claims should also be dismissed because the video evidence establishes no infringement of Plaintiff's exercise of free speech (Count II).  (*Id.*)  In Defendants' moving submission for their motion for summary judgment, Defendants' counsel, Mr. Miller, filed an affirmation to which he annexed three video exhibits (Exhibits A-C) which were the original exhibits submitted with the Defendants' motion to dismiss.  (Miller Aff., Exhibits A-C.)  Mr. Miller also filed an affidavit to which he annexed Exhibit "D" as excerpts from "Mr.

Benny's examination pursuant to Section 50-h of the General
Municipal Law." (ECF No. 44-6, Miller Aff. at ¶ 4.)   Mr. Benny's
sworn testimony in the Exhibit D excerpt describes Mr. Benny's
view of the officers approaching him and his friends, the abrupt
arrest of Mr. Coad, and the officers' instructions to the crowd
to move back to provide space to effect Mr. Coad's arrest.
(Miller Aff., Exh. D at 19-21.)   Defendants also filed the
required statement of undisputed material facts pursuant to
Local Civil Rule 56.1 of this Court.   (*See generally* Defs. Rule
56.1 Statement.)

On November 19, 2021, Mr. Benny filed the required
Local Civil Rule 56.1 response and counter-statement, responding
to the Defendants' statement of undisputed facts including
separate and concise paragraphs of disputed material facts.   Mr.
Benny's 56.1 Statement cites to his declaration and the
allegations in his complaint.   (*See generally* Pl. Rule 56.1
Statement; Pl. Decl. in Opp'n.)

Mr. Benny's counsel, Mr. Brewington, also submitted a
declaration in opposition to Defendants' motion for summary
judgment, providing information regarding the video submission
by plaintiff's counsel (also marked as, and identical to,
Defendants' Exhibit A) and identifying the foregoing Exhibit A
as "contain[ing] the fullest depictions of the events giving
rise to Mr. Benny's claims" and representing Exhibit A as a

"true and accurate recording of Mr. Benny's arrest."  (*See generally* Brewington Decl. in Opp'n.)  Mr. Brewington confirms Exhibit A (the longest of the three videos Defendants also submitted in their exhibits) is a "true and accurate copy of the video recording of Plaintiff's arrest.  (*Id.* at ¶ 7.)  He also submits "true and accurate" copies photos of Mr. Benny's injuries that were taken following his release by the police and medical records pertaining to Mr. Benny's injuries and treatment rendered after his release. (*Id.* at ¶¶ 8-9.)  Mr. Brewington also identifies Exhibit D as a "true and accurate copy of the Decision and Order of Hon. William Miller" "dismissing all three accusatory instruments and all charges" against Mr. Benny, and Exhibit E as a "true and accurate copy of the criminal complaints in the form of Misdemeanor Informations and a Violation Information," signed by Officer Joseph Wiemann on December 8, 2018.  (*Id.* at ¶¶ 10-11.)

Mr. Benny also filed an opposing memorandum of law. (*See generally* ECF No. 45, Pl. Mem. in Opp'n.)  Mr. Benny first contends that Defendants are not entitled to an adverse inference regarding the still unidentified and unproduced video upon which Mr. Benny's counsel relied in drafting the complaint. (Pl. Mem. in Opp'n, 5-7.)  Mr. Benny also argues that a jury could find that Mr. Benny was unlawfully arrested, subjected to excessive force, maliciously prosecuted, and that other officers

failed to intervene and are not entitled to qualified immunity.
(*Id.* at 7-20.)  Mr. Benny also asserts that Defendants did not
move for summary judgment on Mr. Benny's fabrication of evidence
claim, and that he sufficiently establishes the claim of
fabrication of evidence.  (*Id.* at 12-13.)  Mr. Benny alleges
that his Equal Protection and First Amendment claims are
supported by his declarations and the video evidence.  (*Id.* at
21-24.)

Defendants filed a reply memorandum in further support
of their motion for summary judgment.  (ECF. No 46, Defs. Reply
Br.)  Defendants' reply contends that: (1) the evidence and
applicable law establish that the officers' actions did not
constitute excessive force (*id.* at 2); (2) the officers are
entitled to qualified immunity (*id.* at 3-4); (3) there was
probable cause to arrest Mr. Benny for "either or both
disorderly conduct and obstruction of governmental
administration, and/or for resisting arrest" based on the video
evidence in the record (*id.* at 4); (4) given that the video
evidence establishes probable cause, Mr. Benny's malicious
prosecution claim should be dismissed (*id.* at 6), and (5) Mr.
Benny's abuse of process, First Amendment, Equal Protection, and
fabrication of evidence claims fail because he merely relies on
his complaint allegations but failed to present evidence that
created a disputed fact regarding his claims.  (*Id.* at 7-10.)

Defendants' counsel, Mr. Finkel, filed an affidavit to which he annexed Exhibit "E," identified as "a copy of the portion of Mr. Benny's 50-h transcript cited in Defendants' Reply Memorandum of Law." (Finkel Aff. at ¶¶ 2-3.)  Mr. Benny's sworn testimony at his 50-h hearing states that as he faced the Defendant officers as they were approaching him, he did not see or know who had "slammed" him to the ground from behind, and that he got back up before he was "slammed to the ground" again. (Finkel Aff., Exh. E at 26-28.)  Mr. Benny testified at this 50-h hearing that at the time the officers were approaching him, Mr. Benny and six or seven of his friends and other individuals were also on the sidewalk behind him. (*Id*. at 26-28.)

## LEGAL STANDARD

### I. SUMMARY JUDGMENT

Summary judgment is appropriate "only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *See* Fed. R. Civ. P. 56(a); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).  The governing law in each case determines which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for

summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute or issue of material fact by pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support its assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 252. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426

F.3d 549, 553 (2d Cir. 2005).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).

To defeat a motion for summary judgment, the nonmoving party must identify probative, admissible evidence in the record from which a reasonable fact-finder could find in his or her favor.  *Anderson*, 477 U.S. at 256–57.  The non-movant must do more than simply show that there is some "metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.,* 475 U.S. at 586.  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Summary judgment "therefore requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

Local Civil Rule 56.1 requires that the movant also file a "short and concise statement . . . of the material facts

as to which the moving party contends there is no genuine issue to be tried," and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]" Loc. Civ. R. 56.1(a)-(c). Each statement must be supported by a citation to admissible evidence. *Id.* at 56.1(d). The response by the non-moving party must be supported by a "citation to evidence which would be admissible" as required by Federal Rule of Civil Procedure 56(c). *Id.* A reviewing court "may not rely solely on the statement of undisputed facts[,] ... [i]t must be satisfied that the citation to evidence in the record supports the assertion." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 244 (2d Cir. 2004) (citing *Giannullo v. City. of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of the events presented; these are essential questions for a jury. *See id.*

## II. VIDEO EVIDENCE

In certain circumstances, video evidence may be so clear and unambiguous that a court deciding a summary judgment

motion may rely on the video and need not give credit to
assertions that are "blatantly contradicted" by the video
evidence.  *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007).  In
*Scott*, the Supreme Court concluded that, at summary judgment,
the appellate court afforded undue weight to the non-movant's
account of his cautious and careful driving, despite
contradicting video evidence that "more closely resembles a
Hollywood-style car chase of the most frightening sort . . . ."
*Id.* at 380.  In discussing the parties' burdens, the *Scott* court
stated: "When opposing parties tell two different stories, one
of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that
version of the facts for purposes of ruling on a motion for
summary judgment."  *Id.*; *see also Pratt v. Nat'l R.R. Passenger
Corp.,* 709 Fed. App'x 33, 34 (2d Cir. 2017) (concluding that
"objective video and data evidence furnished by the defendants
on summary judgment was sufficient to overcome all contrary
eyewitness testimony and preclude any genuine dispute of
material fact as to the train's speed and horn blasts.")

On the other hand, if the video evidence does not
conclusively resolve material fact issues, summary judgment
based on that evidence alone is not appropriate.  *See Hulett v.
City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017)
(stating that "while the video evidence submitted by the parties

will certainly be considered and carefully reviewed at this
juncture, *Scott* is best understood to permit the summary
adjudication of a plaintiff's civil rights claim only in those
exceptional cases where the video evidence in the record is
sufficient to 'blatantly contradict[ ]' one party's version of
events"); *Zachary v. City of Newburgh*, No. 13-cv-5737 (VB), 2016
WL 4030925, at *8 (S.D.N.Y. July 25, 2016) ("Although the video
evidence casts significant doubt on plaintiff's version of the
events…a reasonable juror could [still] credit plaintiff's
account."); *Rasin v. City of New York*, No. 14-cv-5771 (ARR)
(CLP), 2016 WL 2596038, at *7 (E.D.N.Y. May 4, 2016) ("The
parties have testified to two different stories, and the video
evidence is not so conclusive as to determine this factual
dispute as a matter of law.")

     As the Court will further discuss below, the video
evidence in this case is not nearly so clear-cut as to all of
Plaintiff's claims as the video described in *Scott*, and, in some
instances, portions of the video appear to contradict both
parties' accounts of Mr. Benny's arrest.  Although the parties
submit the same video, Exhibit A, in support of their positions,
and do not dispute the accuracy of any of the videos, they
advance conflicting interpretations of whether aspects of the
videos require a fact-finder to resolve disputes regarding
certain claims.  *See Mack v. Howard*, No. 11-cv-303-A (RJA), 2014

WL 2708468, at *3 (W.D.N.Y. June 16, 2014) (denying summary judgment where the "case boil[ed] down to two credible interpretations of the same video."). As discussed below, the videos are clear and unambiguous as to some of Plaintiff's claims and the Court need not resolve the parties' conflicting assertions that are inconsistent with the video evidence.

As a threshold matter, the Court will not draw any adverse inference with regard to the unproduced video originally described and referenced by Mr. Brewington as providing evidentiary support for Mr. Benny's complaint. After extensive delays and submissions by the parties in response to orders of this Court seeking to identify and produce that video, Mr. Benny and his counsel submitted a video designated by both parties as Exhibit A, and which is identical to Defendant's Exhibit A, and the Court will refer to the video as Exhibit A. The parties agree that Exhibit A, which is at three minutes and fifty-eight seconds long, is accurate and "the fullest depiction of the events giving rise to Mr. Benny's claims." (Brewington Decl. in Opp'n at ¶ 4.)

Defendants argue that to "the extent the videos before the Court on this motion somehow do not resolve all issues of fact, an adverse inference that the missing footage would have been unfavorable to Mr. Benny on all remaining claims is warranted." (Defs. Br. for Summ. J. at 5.) Pursuant to the

Second Circuit's decision in *Residential Funding Corp. v. DeGeorge Financial Corp.*, a party seeking an adverse inference instruction is required only to demonstrate:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense

306 F.3d 99, 107 (2d Cir. 2002). Under this standard, a movant is not required to demonstrate that the spoliator acted with a "culpable state of mind"; a court has discretion to sanction a party for even negligent spoliation. *See Residential Funding*, 306 F.3d at 108.

In this case, Mr. Brewington has repeatedly represented to this Court that he "remain[s] at a loss as to who showed [the video footage]" to him and that he provided to Defendants' counsel the video that Mr. Benny provided to him. (Brewington Decl. in Opp'n. at ¶¶ 2-11; ECF No. 37-1, Second Brewington Decl. in Opp'n to Defs. Mot. to Dismiss at ¶ 4.) Although the elusive footage discussed by Mr. Benny and his counsel delayed much of this Court's prior adjudication of Defendant's motion to dismiss, Mr. Brewington has stated that he does not have possession or control of the initial video that he viewed and used to prepare the complaint. (Brewington Decl. in Opp'n. at ¶¶ 2, 4.) There is no evidence before this Court,

from Defendants or otherwise, that there was a video in Mr. Brewington's actual possession that was destroyed due to a culpable mind or negligence.  Thus, the Court declines to apply any adverse inference, especially because both parties agree that there are these "true and accurate" video recordings of Mr. Benny's arrest, specifically Exhibits A through C.  (*Id.* at ¶¶ 7-9.)  The Court will consider the videos designated Exhibits A through C and the other evidence submitted by parties in deciding Defendants' motion for summary judgment.

## DISCUSSION

### I. SECTION 1983 AND QUALIFIED IMMUNITY

Section 1983 of Title 42 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  To maintain a Section 1983 claim, Mr. Benny must satisfy two elements.  First, "the conduct complained of must have been committed by a person

acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted).  It is undisputed that the Defendants were acting under color of state law during Mr. Benny's arrest and other alleged acts and omissions relating to his claims.  Second, "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Id.; see also McCugan v. Aldana-Brnier*, 752 F.3d 224, 229 (2d Cir. 2014).  Where, as here, Mr. Benny seeks monetary damages, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery.  *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (*citing Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

To prevail, moreover, Mr. Benny must overcome the doctrine of qualified immunity—the individual Defendants' "entitlement not to stand trial under certain circumstances." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985).  For any alleged violation, the qualified immunity analysis proceeds in two parts.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001); s*ee also Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (*quoting Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)).

The second step of the qualified immunity analysis requires the Court to consider "whether [the] right is clearly established"— i.e., "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right…and that in light of pre-existing law the unlawfulness must be apparent."). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (*citing Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999)).

In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, the Court may not evaluate the officer's conduct "with 20/20 hindsight." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). Instead, "[t]he doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances," *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) (citations omitted), and the Court must therefore evaluate challenged conduct "from the perspective of a reasonable officer on the

35

scene." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'")

### II.   THE FALSE ARREST (COUNT III), MALICIOUS PROSECUTION (COUNT III), FABRICATION OF EVIDENCE (COUNT III), AND ABUSE OF PROCESS (COUNT IV) CLAIMS

#### A.   FALSE ARREST (COUNT III)

"In analyzing Section 1983 claims for false arrest, courts 'generally look to the law of the state in which the arrest occurred.'" *Ying Li v. City of New York,* 246 F. Supp. 3d 578, 600 (E.D.N.Y. 2017) (quoting *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016)).  For purposes of the instant action, "[a] claim for false arrest under [S]ection 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law." *Id.* (citing *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)).  Under New York law, the elements of a false arrest claim are: (1) defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise

privileged. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

The existence of probable cause constitutes a "complete defense" to a false arrest claim under Section 1983 and New York state law. *Alvarado v. City of New York*, 453 F. App'x 56, 58 (2d Cir. 2011) (*citing Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *McGuire v. City of New York*, 142 F. App'x 1, 1 (2d Cir. 2005). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and therefore, the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted). When assessing whether probable cause existed, the reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (alteration in original) (internal quotation marks omitted) (*quoting Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

Defendants argue that, as a matter of law, they cannot be liable for false arrest because they had probable cause to arrest Mr. Benny or, in the alternative, they are entitled to qualified immunity.  Further, because qualified immunity protects officers who reasonably believe their conduct to be lawful, the existence of "arguable probable cause" establishes a qualified immunity defense.  *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citations omitted); *see also Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013).  As with the probable cause inquiry, the Court's inquiry regarding arguable probable cause is confined to the facts known to the arresting officer at the time of the arrest.  *Betts v. Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014); *Picott v. Chatmon*, No. 12-cv-7202, 2017 WL 4155375, at *5 (S.D.N.Y. Sept. 18, 2017).  The Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Jenkins*, 478 F.3d at 87.  Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Golino v. City of*

*New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citations omitted); *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) ("[I]n situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." (citing *Lennon*, 66 F.3d at 423)).

Based on the record before the Court, including the undisputed video evidence in Exhibits A through C, the Court finds that Defendants had probable cause to arrest Mr. Benny for obstructing governmental administration, disorderly conduct, and resisting arrest. *See Marcavage v. City of New York*, 689 F.3d 98, 109–10 (2d Cir. 2012) ("A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge (internal citation omitted)).

### 1) *Obstruction of Governmental Administration*

New York Penal Law § 195.05 defines the crime of obstructing governmental administration in the second degree and provides, in relevant part, that:

> A person is guilty of obstructing governmental administration in the second degree when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act

        .   .   .   .

N.Y. Penal Law § 195.05.

        The offense has four elements: "(1) prevention or
attempt to prevent (2) a public servant from performing (3) an
official function (4) by means of intimidation, force or
interference." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d
Cir. 2010) (quoting *Lennon* 66 F.3d at 424).  New York courts
have confirmed that the fourth element requires physical
interference, although the interference can be minimally
physical, and "inappropriate and disruptive conduct at the scene
of the performance of an official function" will suffice.
*Basinski v. City of New York*, 706 F. App'x 693, 698 (summary
order) (discussing cases interpreting New York obstruction of
governmental administration statute) (quoting *Kass v. City of
New York*, 864 F.3d 200, 209 (2d Cir. 2017, and collecting
cases).  For example, in *Davan L.*, the New York Court of Appeals
affirmed a finding that, where a juvenile had been "put on
specific, direct notice" of a "confined and defined" area of
police activity and told to keep away, and the juvenile
"intentionally intruded himself into the area" to warn others of
police presence, the juvenile's conduct met the elements of
obstruction of governmental administration.  *See Matter of Davan
L.*, 689 N.E.2d 909, 910-11 (N.Y. 1997).  This Court has held
that when individuals disobey officers' orders to step back

40

during an arrest of another individual, the facts establish probable cause for arrest. *See Leibovitz v. City of New York*, No. 14-CV-7106(KAM)(LB), 2018 WL 1157872, at *1 (E.D.N.Y. Mar. 2, 2018).

In the Second Circuit's *Kass* decision, the plaintiff had been speaking with protestors on a sidewalk adjacent to a protest site.  864 F.3d at 208.  In their efforts to regulate pedestrian traffic and address crowd-control issues, officers directed the plaintiff "to either keep walking or enter [the] designated protest area." *Id*. at 209.  The plaintiff "verbally and physically refused to obey the officers' orders" and was arrested. *Id*. at 210.  The district court denied a motion for judgment on the pleadings based on qualified immunity and was reversed by the Second Circuit which held that the officers had at least arguable probable cause to arrest the plaintiff for obstructing governmental administration in violation of New York Penal Law § 195.05. *Id*. at 203.

In considering the instant motion, and as discussed above, the Court finds that Exhibit A clearly and indisputably establishes that Mr. Benny repeatedly defied Defendant officers' multiple orders to "back up" and "clear the area" as they sought to secure the area in which multiple bystanders had gathered while the officers were arresting an individual.  (Exhibit A, 00:14-00:58.)  Under the circumstances, the police orders were

proper, as the officers were attempting, at the time, to arrest

Mr. Coad and maintain order among onlookers in the vicinity

where police had been called to respond to a fight.  Mr. Benny,

for at least one minute while on camera is repeatedly seen

retreating and reapproaching the officers as he raises his voice

at the officers and requestions them.  (*Id.*)  The officers

repeatedly direct Mr. Benny to move back and "clear the area".

(*Id.*)  The video also shows Mr. Benny moving towards the

individual Defendant officers who were continuing to direct the

onlookers to "back up" and "clear the area" as Mr. Benny points

a finger in their direction and tells the officers, "no".  (*Id.*

at 00:40-00:46.)  Defendants stand in front of Mr. Benny and

direct the onlookers, including Mr. Benny, to "clear the area

right now" no less than seven times with Mr. Benny repeatedly

refusing and responding, "no, I have the right."  (*Id.* at 00:46-

1:06.)  During this time, one of Mr. Benny's friends tells Mr.

Benny "come on" in an attempt to get him to comply and step

away, and Mr. Benny also responds "no" to his companion.  (*Id.*)

When Defendants thereafter state, at least three times, that

this is the "last warning" to "clear the area" and that Mr.

Benny is "acting disorderly," Mr. Benny responds with several

"no"s and "I'm not, though."  (*Id.* at 01:06-01:10.)  It is

during this last moment of Mr. Benny's noncompliance with

Defendants' orders that Defendants advise Mr. Benny that he is

under arrest.  (*Id.* at 01:13.)  Exhibit B and Exhibit C also clearly establish that Mr. Benny defied repeated orders by the police officers to step back and clear the area while continuing to yell at police who were attempting to effect an arrest and control the crowd.  (Exhibit B, 00:01-00:13; Exhibit C, 00:12-00:25.)

Mr. Benny communicated his intent, multiple times, to disobey Defendants' orders to move back and clear the area, and in fact disobeyed the orders.  Taken as a whole, and even when viewed in the light most favorable to Mr. Benny, the video recordings, which the parties agree accurately depict the events surrounding Mr. Benny's arrest, establish that the officers had probable cause to arrest Mr. Benny for obstruction of governmental administration for his repeated intentional efforts to prevent the officers from performing their official functions by his physical interference and intrusions.

Mr. Benny contends that his own arrest could not have been supported by probable cause, because he was protesting the false arrest of Mr. Coad.  (See generally ECF No. 45, Pl. Mem. in Opp'n.)  There is no evidence before the Court that the officers lacked probable cause at the time to arrest Mr. Coad, and in any case, disagreeing with an officer's arrest of another is not a defense to obstructing governmental administration. Regardless of whether the arrest of another individual is

appropriate, the law does not protect onlookers who obstruct governmental administration, based on their own view of whether police conduct is appropriate.  Although bystanders may legally record police action, they may not repeatedly intrude into the area of police activity or an area that police are attempting to control, while disregarding police orders to "back up" and "clear the area".  *See Bruno v. City of Schenectady*, No. 12-CV-285(GTS)(RFT), 2016 WL 1057041, at *12 (N.D.N.Y. Mar. 14, 2016) (finding probable cause to arrest where "Plaintiff's repeated and deliberate disregard of Defendant['s] . . . order to stay behind the police tape, which was exacerbated by her disruptive harangue, interfered with [Defendant's] performance of his [official] dut[ies].")  Because probable cause is an absolute defense to a false arrest claim, Mr. Benny's false arrest claim fails and must be dismissed.

### 2) *Disorderly Conduct*

To prove the crime of disorderly conduct under New York Penal Law § 240.20, Defendants must establish three elements: (i) the defendant's conduct must be "public" in nature, (ii) it must be done with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof," and (iii) it must match at least one of the descriptions set forth in the statute.  N.Y. Penal Law § 240.20. The Defendants reported that Mr. Benny violated subdivision six

of N.Y. Penal Law § 240.20, because Mr. Benny "congregate[d] with other persons in a public place and refuse[d] to comply with a lawful order of the police to disperse." (*See* ECF No. 45-4, Brewington Decl. in Opp'n., Exh. E, Misdemeanor Information filed on December 8, 2018.)

With respect to disorderly conduct, the Court concludes that Mr. Benny's conduct on December 8, 2018, as depicted in the video Exhibits A through C, satisfies all of the elements to establish probable cause for his arrest.  Mr. Benny's interaction with the Defendants on the night of his arrest was in public, taking place on the sidewalk outside of the Whale's Tale, in the vicinity of a fight where others had gathered.  (*See generally* Exhibit A-C.)  The Court finds that based on the undisputed video evidence, reasonable officers would agree that Mr. Benny's continued refusal to step away or leave the area after Defendants repeatedly asked him to do so, "recklessly creat[ed] a risk" of "caus[ing] public inconvenience, annoyance or alarm."  *See* N.Y. Penal Law § 240.20(6); *see also Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001)(holding that if a reasonable person in the same circumstances of an officer would have believed defendant's conduct satisfied all three elements of § 240.20, the defendant had committed or in fact committed the crime of disorderly conduct).  Although "the risk of public disorder does not have

45

to be realized[,] the circumstances must be such that defendant's intent to create such a threat (or reckless disregard thereof) can be readily inferred." *Monahan v. City of New York*, No. 20-CV-2610 (PKC), 2022 WL 954463, at *4 (S.D.N.Y. Mar. 30, 2022) (citation omitted).

The video evidence before the Court establishes that Mr. Benny grew increasingly agitated, as he repeatedly approached the officers who directed him multiple times to step back and raised his voice to question and object to the officers' actions as the officers were arresting Mr. Coad and were attempting to keep the crowd from approaching. (Exhibit A, 00:14-00:58, Exhibit B, 00:01-00:13; Exhibit C, 00:12-00:25.)

Mr. Benny argues that he did not refuse to comply with a lawful order to disperse, as required by New York Penal Law § 240.20(6), because he was acting alone and his failure to disperse was not done with the intent to cause public inconvenience. The videos demonstrate that Mr. Benny was among a group of onlookers and was directed by Defendants to "back up" and "clear the area," after he continued to approach the officers. Exhibit A, filmed by another individual, shows both Mr. Benny and others repeatedly being directed by the officers to "back up" and "clear the area," and Mr. Benny repeatedly responds "no." (*See generally* Exhibit A.) He was in a crowd and appears to be the only one approaching the officers and

being told to step back.  (*Id.*)  Moreover, Mr. Benny testified
in his 50-h hearing that he estimated there were "maybe six to
seven" "other people" around him when the Defendants approached
him.  (Finkel Aff., Exh. E at 28.)[9]  The Exhibit C video also
clearly shows there are at least five bystanders in the
background as Mr. Benny interacts with the officers before his
arrest.  For the foregoing reasons, the Court concludes that the
Defendants had probable cause to arrest Mr. Benny for disorderly
conduct.

### 1) Resisting Arrest

New York Penal Law § 205.30 defines the crime of
resisting arrest and provides, in relevant part, that: a person
is guilty of resisting arrest when he intentionally prevents or
attempts to prevent a police officer or peace officer from
effecting an authorized arrested of himself or another person.

Exhibits A through C clearly show that Mr. Benny
defied repeated orders to step back and clear the area while
continuing to yell at police who were attempting to effect an
arrest and control the crowd.  In Exhibit B, the video shows
that after Mr. Benny was told he was under arrest and to turn
around, he spins and tries to break free of the Defendant

---

[9] The Court also notes that Mr. Benny stated he did "not want to give an exact
count" of the people on the sidewalk, but he confirmed that "there were
people other than [his] friends on the sidewalk with [him]."  (Finkel Aff,
Exh. E at ¶¶ 28-29.)

officer's initial attempt to arrest him.  (Exhibit B, 00:17-
00:21.)  At this time, other voices say "chill," although it is
not clear who the statements are directed to or who is making
the statements.  (*Id.*)  Exhibit B shows that after the officers
stated their intention to put Mr. Benny under arrest, Mr. Benny
and the officers scuffled for seconds as they pushed one
another, until the officers brought Mr. Benny to the ground face
down.  The officers held Mr. Benny down while attempting to
place him in handcuffs.  (Exhibit B, 01:15-01:24.)  Despite what
Mr. Benny asserts in his Rule 56.1 counter statement and
declaration, all of the videos undeniably demonstrate that Mr.
Benny "intentionally prevent[ed] or attempt[ed] to prevent"
Defendants from effecting the arrest of Mr. Coad.  (*See
generally* Exhibits A-C.)  Moreover, with regards to Mr. Benny's
own arrest, after he was advised under arrest, the video shows
that he spun free of the officers and engaged in a physical
tussle with the officers.  (*Id.*)

        Accordingly, Defendants demonstrated with undisputed,
clear and unambiguous, and admissible video evidence that the
officers had probable cause to arrest Mr. Benny for any and all
offenses with which he was charged.  *See Jaegly v. Couch,* 439
F.3d 149, 154 (2d Cir. 2006) ("Following *Devenpeck*, . . . a
claim for false arrest turns only on whether probable cause
existed to arrest a defendant, and…it is not relevant whether

probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest.").

Here, Exhibits A through C depict the indisputable facts and circumstances known to the officers sufficient to establish probable cause to arrest Mr. Benny for obstruction of governmental administration in violation of New York Penal Law § 195.05, disorderly conduct in violation of New York Penal Law § 240.20(6), and resisting arrest in violation of New York Penal Law § 203.30.  Mr. Benny's own declaration, to the extent he seeks to contradict what is clear from the video evidence, fails to create a genuine disputed factual issue regarding his Section 1983 false arrest claim.  Consequently, Defendants' motion for summary judgment is granted as to Mr. Benny's false arrest claim.

### 2) Qualified Immunity

Alternatively, based on the authorities discussed above, the Court finds that Defendants had "arguable probable cause" to arrest Mr. Benny.  *Golino*, 950 F.2d at 870.  Mr. Benny's continued reapproaching of the officers, after repeated directives to step back, could cause a reasonable officer to believe that Mr. Benny intended to interfere with the officers' exercise of their authority to effect another arrest and maintain control of multiple bystanders.  N.Y. Penal Law §

195.05.  Given the context in which Mr. Benny repeatedly stated
his refusal, and in fact refused, to comply with the officers'
orders, it was also objectively reasonable for the officers to
infer that Mr. Benny's continued defiance of their orders
recklessly created a risk that he would "cause public
inconvenience, annoyance or alarm," including a public
disturbance.  N.Y. Penal Law § 240.20(6).  Lastly, an officer
reasonably could believe that they had "arguable probable cause"
to believe that Mr. Benny was resisting arrest as he scuffled
with the police officers after they notified him that he was
under arrest, and based on Defendants' attempts to not once, but
twice, to physically place Mr. Benny under arrest.  N.Y. Penal
Law § § 203.30.  The individual Defendants are therefore
entitled to qualified immunity with respect to Mr. Benny's
Section 1983 claim for false arrest.

B.   **MALICIOUS PROSECTUION (COUNT III)**

For the reasons provided below, the Court also grants
Defendants' motion for summary judgment on Mr. Benny's claims
for malicious prosecution claims.  "[I]n recognizing a malicious
prosecution claim when the prosecution depends on a violation of
federal rights, [Section 1983] adopts the law of the forum state
so far as the elements of the claim for malicious prosecution
are concerned."  *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir.
2010) (citation omitted).  To establish a [S]ection 1983 claim

for malicious prosecution, a plaintiff must prove the following four elements under New York law: "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions' — as well as a violation of the plaintiff's rights under the Fourth Amendment." *Ying Li*, 246 F. Supp. 3d at 604 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010)); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  Probable cause for purposes of malicious prosecution is different from probable cause for arrest.  *Ying Li*, 246 F. Supp. 3d at 611 (citing *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)).  Probable cause to prosecute exists where there are "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76.  To determine whether probable cause exists sufficiently to defeat a malicious prosecution claim, a court must separately analyze each "charge[…] claimed to have been maliciously prosecuted." *Morris v. Silvestre*, 604 F. App'x 22, 25 (2d. Cir. 2015) (quoting *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) ); *see also D'Angelo v. Kirschner*, 288 F. App'x 724, 726–27 (2d Cir. 2008) ("a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious

51

prosecution as to other criminal charges"). Thus, the relevant question is "whether sufficient probable cause existed to charge [Mr. Benny] with each of the crimes." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)

Here, it is undisputed that the Defendants had probable cause to prosecute Mr. Benny for (1) obstruction of government administration, (2) disorderly conduct, and (3) resisting arrest. The Exhibit B video, which provides a clear angle of Mr. Benny scuffling with the police officers as they attempt to arrest him, in particular highlights Mr. Benny's actions that provided probable cause for the officers to bring all the charges against Mr. Benny. (*See generally* Exhibit B.) As discussed, *supra*, Exhibit B very clearly shows that Mr. Benny defied repeated orders to step back and clear the area while he continued to yell at police officers who were attempting to effect an arrest and control the crowd. (Exhibit B, 00:13-00:17.) In Exhibit B, Mr. Benny also spins and breaks free of the officer as he attempts to place him under arrest. (Exhibit B, 00:17-00:21.) Exhibit B shows that Mr. Benny and the officers scuffled for seconds as they pushed one another, until the officers brought Mr. Benny to the ground face down. (*Id.* at 00:21-00:28.) Based on the Court's consideration of the video evidence demonstrating that there was probable to arrest Mr. Benny for obstructing governmental administration, disorderly

conduct, and resisting arrest, this Court further concludes that there was probable cause for a reasonably prudent person to commence the prosecution and to believe Mr. Benny to be guilty of both charges.

Mr. Benny also provides no evidence that the officers were motivated by malice while carrying out their duties and including the three charges of obstruction of governmental administration, disorderly conduct, and resisting arrest against Mr. Benny in their three accusatory instruments. (*See* Brewington Decl. in Opp'n., Exh. E, Misdemeanor Information filed on December 8, 2018.)  Even though a judge ultimately dismissed the charges, at the time Mr. Benny's prosecution was commenced, based on the record before the Court, probable cause existed to do so.  Moreover, there is no evidence from which a jury could find that the Defendants acted with actual malice. The Court therefore grants Defendants' motion for summary judgment as to Mr. Benny malicious prosecution claims.

## C.   ABUSE OF PROCSES (COUNT IV)

The Court also grants Defendant's motion for summary judgment as to Mr. Benny's abuse of process claims.  The Second Circuit has stated that "[a]buse of process, however, does not depend upon whether or not the action was brought without probable cause or upon the outcome of the litigation." *Lodges 743 and 1746, Int'l Ass'n of Machinists & Aerospace Workers,*

*AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 465 n. 85 (2d Cir.1975).  In explaining a claim for abuse of process, the Second Circuit has stated:

> [T]he gist of the tort of abuse of process, [as] distinguished from malicious prosecution, is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.

*See Weiss v. Hunna*, 312 F.2d 711, 717 (2d Cir.1963) (quotation omitted).

Consistent with the Second Circuit's analysis in *United Aircraft Corp.* and *Weiss*, a plaintiff may prove an abuse of process claim where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

Here, Mr. Benny provides no evidence from which a jury could find that Defendants prosecuted Mr. Benny to "compel" Mr. Benny to perform or forebear from an act, with intent to do harm without justification.  Mr. Benny also fails to provide evidence of the third element, that Defendants had a "collateral

objective that is outside the legitimate ends of the process."
There is no genuine dispute of material fact that the Defendants
were performing their official duties during the events
undergirding this action, when they responded to an altercation
at or near a bar, maintained control of the crowd, and effected
Mr. Benny's arrest.  Mr. Benny's bare argument that his
continued prosecution was to "block [him] from access to the
Court and seeking justice against them for wrongful acts" is not
supported by any evidence.  (Pl. Mem. in Opp'n. at 19.)
Furthermore, Mr. Benny's unsupported contention that Defendants'
utilization of the "process" is symptomatic of the Defendants'
"own warped sense of power" (*id.*) is insufficient to establish
that Defendants acted with an illegitimate collateral objective.
*See Hauser v. Bartow*, 273 N.Y. 370, 374 (1973) ("If [one] uses
the process of the court for its proper purpose, though there is
malice in his heart, there is no abuse of process.").  The Court
therefore grants Defendants' motion for summary judgment as to
Mr. Benny abuse of process claims.

   D.   **FABRICATION OF EVIDENCE (COUNT III)**

        As a threshold matter, this Court notes that although
Defendants did not move for summary judgment on Mr. Benny's
fabrication of evidence claim, pursuant to Federal Rule of Civil
Procedure 56(f), both parties had "reasonable time to respond"
and thus this Court will "consider summary judgment on its own

after identifying for the parties material facts that may not be genuinely in dispute." (*See* Pl. Mem. in Opp'n at 11-13; Defs. Reply Br at 9-10.) *See also Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000) ("a *sua sponte* grant of summary judgment against that party may be appropriate" when "there are circumstances under which it is not a reversible error for a district court to grant summary judgment against a party without notice or opportunity to defend"); *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 96 (2d Cir. 2016) (grants of summary judgment are only appropriate "where the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried" (citing *Schwan-Stabilo Cosmetics GmbH v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005)). The Second Circuit has said that in instances where the district court failed to give notice before *sua sponte* granting summary judgment, if the party "either cannot claim to have been surprised by the district court's action or if, notwithstanding its surprise, the party had no additional evidence to bring, it cannot plausibly argue that it was prejudiced by the lack of notice." *Bridgeway Corp.*, 201 F.3d at 140.

    To succeed on a fabricated-evidence claim, Mr. Benny must establish that an (1) investigating official (2)

fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] a deprivation of life, liberty, or property as a result. *See Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021) (citation omitted).

Here, given Mr. Benny's opportunity to defend his fabrication of evidence claims, the Court grants summary judgment to Defendants on Mr. Benny's fabrication of evidence claim.  Mr. Benny briefed his fabrication of evidence claim in his memorandum of law in opposition to Defendants' motion for summary judgment.  (*See* Pl. Mem. in Opp'n at 11-13.)  Mr. Benny alleged that Officer Wiemann fabricated evidence by signing accusatory instruments that claimed Mr. Benny "physically resist[ed] the defendants' efforts to arrest him."  (*Id*; Brewington Decl. in Opp'n., Exh. E, Misdemeanor Information filed on December 8, 2018.)  The Court has considered the parties' evidence for the related claims of false arrest, malicious prosecution, and abuse of process, and presumes that Mr. Benny has had no additional evidence to bring for his fabrication of evidence claim.  Accordingly, this Court relies on the video evidence recounted in extensive detail above and finds that Mr. Benny and the officers scuffled for some time during Mr. Benny's arrest.  (*See generally* Exhibit A and B.) The video recordings of Mr. Benny and Defendants struggling,

after Mr. Benny was told he was under arrest and spun out of an officer's grasp, blatantly contradicts Mr. Benny's account that he did not "physically resist[] the defendants' efforts to arrest him" as alleged by the Officer Wiemann in the accusatory instruments. (*See* Brewington Decl. in Opp'n., Exh. E, Misdemeanor Information filed on December 8, 2018.)  Mr. Benny fails to identify or provide any evidence of the information he claims is fabricated, that he resisted arrest, and therefore, the Court grants summary judgment as to Mr. Benny's fabrication of evidence claim.

### III.   EXCESSIVE FORCE (COUNT III) & FAILURE TO INTERVENE (COUNT VI)

#### A.   EXCESSIVE FORCE (COUNT III)

The Court denies Defendants' motion for summary judgment as to Mr. Benny's claims of excessive force and failure to intervene.  Mr. Benny alleges that Defendants violated the Fourth and Fifth Amendments by using excessive force in effecting his arrest.  Here, the Court finds that there are genuine disputes of material fact, whether the Defendants used excessive force in effecting Mr. Benny's arrest.  Based on the lack of clarity in the video evidence as to the Defendants' use of force, the parties' differing interpretations of the videos, and the parties' differing accounts of the force used to effect Mr. Benny's arrest, the Court finds that summary judgment on Mr.

Benny's excessive force claim must be denied.  The jury must resolve the dispute of whether the Defendants' use of force was excessive or reasonable.

The Fourth Amendment, which guarantees the right to be free from unreasonable seizures, prohibits police officers from using excessive force in effecting an arrest.  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 395)).  Courts apply an objective reasonableness standard to determine whether the force used was excessive.  *Id.* (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)).  Thus, "the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir.2004)).

To determine whether the force used was reasonable, courts consider "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Graham*, 490 U.S. at 396; *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir.2006)).  The Court recognizes that evidence is viewed "from the perspective

of a reasonable officer on the scene," allowing for "the fact
that police officers are often forced to make split-second
judgments-in circumstances that are tense, uncertain, and
rapidly evolving-about the amount of force that is necessary in
a particular situation." *Id.* at 96.  This Court also notes that
"[n]ot every push or shove, even if it may later seem
unnecessary in the peace of a judge's chambers, violates a[n]
[individual's] constitutional rights." *Johnson v. Glick*, 481
F.2d 1028, 1033 (2d Cir. 1973).

     The video evidence clearly reveals the following
events: after the officer gave repeated directives to "back up"
and "clear the area" and warned Mr. Benny, "final warning," he
informed Mr. Benny that he was under arrest and directed him to
turn around.  (Exhibit A, 01:14-01:15.)  The camera does not
show Mr. Benny, so it is unclear what Mr. Benny was doing or if
Mr. Benny was within reaching distance of the officer.  (*Id.*)
Approximately one second after the Defendant officer informed
Mr. Benny he was under arrest and directed him to turn around,
the camera shows that either the same officer or another officer
(it is not clear in any of the videos) wraps his arms around Mr.
Benny and attempts to place him under arrest.  (*Id.* at 01:15-
01:16.)  In Exhibit B, the video recording also does not capture
what happens between a Defendant officer telling Mr. Benny he is

60

under arrest and part of Mr. Benny's body being lowered toward the ground. (Exhibit B, 00:13-00:19.)

It is undisputed that Exhibit A and B demonstrate that once a Defendant officer tries to take Mr. Benny into custody, Mr. Benny tries to spin and break free of the officer's grasp before his hands and knees momentarily make contact with the ground. (Exhibit A, 01:17-01:18.) What remains unclear in all three video exhibits, however, is what happened in the second between a Defendant officer telling Mr. Benny he was under arrest and, potentially another or the same, Defendant officer putting his arms around Mr. Benny in an attempt to place him in custody. Furthermore, after Mr. Benny spun and broke free of the officer, and then engaged in a tussle with the officers, Mr. Benny is seen on the ground, with at least two officers holding him down, while his hands are behind his back, as the officers try to put handcuffs on him. (Exhibit A, 01:26-01:48.) Mr. Benny's face and the front of his body are fully on the sidewalk, a Defendant officer has his knee on Mr. Benny's cheek by the officer, and the amount of weight applied to Mr. Benny's cheek is not clear. But approximately twenty seconds, other bystanders ask "why are you on his face" until a Defendant officer moves his knee to Mr. Benny's back. (*Id.*) Another Defendant officer asks the individual recording the video to "back up" while the individual yells that the Defendants should

not have had their knee on Mr. Benny's face.  (*Id*. at 01:48-
02:18.)  The Court cannot and should not determine whether the
level of force used to arrest Mr. was reasonable or excessive,
during the fast-paced "split-second" physical encounter between
Mr. Benny and the officers.  After careful consideration of the
videos and declarations, this Court finds that there are genuine
material issues of fact in dispute, and this Court cannot
conclusively determine whether the elements of excessive force
were met.

      The Court also highlights that the video evidence
indeed reveals discrepancies or gaps in both Defendants' and Mr.
Benny's accounts of the arrest.  Though Mr. Benny's declaration
stated that he did not resist arrest, the video clearly shows a
prolonged struggle between Mr. Benny and Defendants, where Mr.
Benny twists away and stands upright after being initially
restrained and Mr. Benny then lunges towards and scuffles with
the officers.  (*Id*. at 01:19-01:33.)  Despite the existence of
probable cause to arrest Mr. Benny and charge him with
obstruction of governmental administration, disorderly conduct,
and resisting arrest, a reasonable juror could also find that
the use of force in effecting Mr. Benny's arrest was excessive,
under the circumstances to be presented at trial.  (*Id*.)  Based
on the video evidence, Defendants assert that Mr. Benny pushed
an officer on the chest, which may have occurred during the

scuffle between Mr. Benny and the officers depicted in the
videos.  But the videos still do not show what, if anything, Mr.
Benny did to prompt the officer's initial attempt to restrain
Mr. Benny and place him on the ground.  Furthermore, the
Defendants assert that they removed their knee off Mr. Benny "as
soon as [Mr. Benny] was brought to his feet," which is not
depicted in the videos.  (Defs. Reply Br. at 6.)

        Even with video evidence, Mr. Benny and Defendants'
accounts of the events on December 8, 2018 differ substantially,
raising disputed issues of material fact.  Because there are
multiple questions left unanswered in the record before the
Court of what transpired immediately prior to and during Mr.
Benny's arrest, and the amount of force used, to explain whether
the officers used reasonable force, this Court must leave fact-
finding to the jury.  *See Amnesty*, 361 F.3d 113 ("Because a
reasonable jury could also find that the officers gratuitously
inflicted pain in a manner that was not a reasonable response to
the circumstances, however, the determination as to the
objective reasonableness of the force used must be made by a
jury following a trial."); *Curry v. City of Syracus*e, 316 F.3d
324, 335–36 (2d Cir. 2003) ("In sum, based on the two starkly
different narratives of the incident at issue, genuine issues of
material fact preclude summary judgment on plaintiff's false
arrest and unlawful search claims.").

Indeed, even if a genuine issue exists as to whether force was excessive, officers may invoke qualified immunity's second prong, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Anderson,* 483 U.S. 640.  The qualified immunity analysis hinges on whether under the totality of the circumstances, the officers used reasonable force or "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, the Court must look to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

It is clearly established in the Second Circuit that "it [is] a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety." *See Muschette on Behalf of A.M. v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2018); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015) (finding that officers who jumped on the back of a non-resisting arrestee were not entitled to summary judgment on the merits or on the defense of qualified immunity); *O'Hara v. City of New York*, 570 F. App'x 21, 24 (2d Cir. 2014) (punching an arrestee without provocation was excessive force and there is a

distinction between "struggling against" the officer's blows and resisting arrest); *Ragland v. City of Mount Vernon*, No. 11 CV 1317 VB, 2013 WL 4038616, at *6 (S.D.N.Y. July 12, 2013) (evidence that officers, without warning, grabbed plaintiff's neck and jumped on his back while he was riding his bicycle precluded summary judgment on excessive force); *Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir. 1989) (concluding that a plaintiff's testimony about being immediately shoved to the floor upon answering an officer's door knock could defeat a motion for summary judgment as a matter of law); *Sash v. United States*, 674 F. Supp. 2d 531, 538 (S.D.N.Y. 2009) ("Tackling an arrestee on the street and forcibly shoving him into a metal gate when he offers no resistance certainly could be actionable conduct."). The standard of reasonableness standard must be applied to the moment that force was used. *Graham*, 490 U.S. at 396. The degree of force used, if any, and the moment of force used are not clear from the record.

Although there is evidence of Mr. Benny's interaction with the Defendants *after* a Defendant officer tries to bring Mr. Benny under arrest the first time, the video evidence and Mr. Benny's declaration of the events *prior to* and during his arrest cannot be reconciled at this time. Defendants' motion for summary judgment on Mr. Benny's excessive force claim must be, and is, denied. *See Mills v. Fenger*, 216 Fed. Appx. 7, 8-9 (2d

Cir. 2006) (citing *Thomas*, 165 F.3d at 143) ("Because whether force is excessive turns on its reasonableness, we have held that '[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.'"); *see also Coe v. Rogers*, No. cv 14-3216(JFB)(AKT), 2017 WL 1157182, at *14 (E.D.N.Y. Mar. 6, 2017), report and recommendation adopted, No. 14-3216(JFB)(AKT), 2017 WL 1155002 (E.D.N.Y. Mar. 27, 2017) (finding that when there were two "competing versions of the events," of an officer's "body-slamming" of plaintiff, whether excessive force was used must be left for a jury to decided).

Despite all of the video evidence and parties' submissions, it remains unclear whether Mr. Benny had any time to comply with the arresting officer's order to turn around after he was told he was under arrest, what Mr. Benny did in response, and what degree of force the officer used.  The facts around the moment of the officer's use of force are material and disputed.  Thus, this Court finds that the jury must decide whether the officer's use of force was reasonable under the circumstances.

**B.   FAILURE TO INTERVENE (COUNT VI)**

An underlying constitutional violation is a precondition of a failure-to-intervene claim.  *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).  To establish

liability on the part of a defendant under a failure-to-intervene theory, a plaintiff must show that the defendant (1) possessed actual knowledge that a fellow officer was using excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Kornegay v. New York*, 677 F.Supp.2d 653, 658 (W.D.N.Y. 2010). Police officers are "under a duty to intervene and prevent fellow officers from subjecting a citizen to excessive force and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).  If a fellow officer fails to intervene, "liability attaches on the theory that the officer . . . becomes a 'tacit collaborator' in the illegality." *Id*. (quoting *O'Neill*, 839 F.2d 11-12 (2d Cir. 1988)); *see also Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("An officer who fails to intercede in the use of excessive force . . . is liable for the preventable harm caused by the actions of other officers.").

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Terebesi*, 764 F.3d at

244 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Defendants provide no declarations of any officers detailing their knowledge or involvement, or lack thereof, of their opportunity to intervene in Mr. Benny's arrest, and therefore, the Court must consider Mr. Benny's sworn statements and the evidence of multiple unidentified officers present during the alleged use of excessive use of force. Although the Court recognizes "the mere fact that [an] [o]fficer was present for the entire incident does not, on its own, establish that he had either awareness of excessive force being used or an opportunity to prevent it," it is not clear whether excessive force was used and, if so, which officers were simply present or aware, or had an opportunity to intervene. *See Rodriguez v. City of New York*, No. 10 CIV. 9570 PKC KNF, 2012 WL 1658303, at *5 (S.D.N.Y. May 11, 2012). Based on the record before the Court and considering the evidence in the light most favorable to the nonmoving party, Mr. Benny, a question of material fact exists as to whether the force used was excessive and whether the other officers failed to intervene. If, as he claims, Mr. Benny had fully submitted to the officers' control and Defendants observed a fellow officer use unnecessary force but failed to intervene despite having time to do so, no reasonable officer under the circumstances would believe that his or her

actions were lawful.  Therefore, the Court cannot find that qualified immunity applies under the circumstances presented by the record before the Court.  The Defendants' motion for summary judgment on Mr. Benny's excessive force and failure to intervene is denied.

### IV.   FIRST AMENDMENT CLAIM (COUNT II)

The Court grants summary judgment for Defendants as to Mr. Benny's First Amendment claim.  "To recover on a First Amendment claim under [Section 1983], a plaintiff must demonstrate that his conduct is deserving of First Amendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech."  *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991) (quoting *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) ("To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." (citation omitted)).  The Court finds that no reasonable juror could find that Defendants deprived Mr. Benny of his First Amendment rights.

Mr. Benny asserts that there is a First Amendment right to videotape police officers in the performance of their official duties.  This Court notes, however, that the right to videotape is "not without limitations" and "may be subject to reasonable time, place, and manner restrictions." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (citing *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000)); *see also Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) ("All of the circuit courts that have [addressed the issue] . . . have concluded that the First Amendment protects the right to record police officers performing their duties in a public space, subject to reasonable time, place and manner restrictions." (citations omitted)).  Time, place, and manner restrictions, in turn, are permissible if they "(1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information." *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) (quoting *Marcavage*, 689 F.3d 98 at 104.)).  Furthermore, "the right [to record police officers in public] does not apply when the recording would impede police officers in the performance of their duties." *Higginbotham*, 105 F. Supp. 3d at 379-80; *see also Basinksi*, 192 F. Supp. 3d at 368 ("[C]ourts within this

Circuit have recognized that 'in cases where the right to record police activity has been recognized by our sister circuits, it appears that the protected conduct has typically involved using a handheld device to photograph or videotape at a certain distance from, and without interfering with, the police activity at issue.'" (quoting *Rivera v. Foley*, No. 14-CV-196(VLB), 2015 WL 1296258, at *10 (D. Conn. Mar. 23, 2015)).

When viewing these allegations in the light most favorable to Mr. Benny, Defendants' initial and repeated instructions to step back constitute a justified and narrow restriction on the place and manner in which Mr. Benny could exercise his asserted First Amendment right to film Defendants' arrest of Mr. Coad. Here, the government had a compelling interest in maintaining safety and order while a crowd continued to gather at the scene of police activities. *See Bruno*, No. 12-CV-285(GTS)(RFT), 2016 WL 1057041, at *12 (finding probable cause to arrest where plaintiff disregarded officers' orders to stay behind the police tape); *Davan L.*, 689 N.E.2d 910-11 (affirming finding that juvenile's conduct, if committed by an adult, would constitute obstruction of governmental administration where juvenile had been directed to stay clear of "confined and defined" police activity area, but entered area and yelled that police were "coming"); *see also Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015) ("Police officers

frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc.").

The video Exhibits A through C show that none of the officers ever told any of the bystanders recording their activities that they could not record, but only directed that they step back. (*See generally* Exhibit A-C). Based on the undisputed evidence of what was captured in the videos, the Defendants' instructions to step back were justified and narrowly tailored to serve a compelling government interest in maintaining order amidst a gathering crowd while conducting police activity. Indeed, the video evidence establishes that Mr. Benny continued to film the scene, until he defied the officers' final warning to "back up" and was placed under arrest. (*Id.*)

Alternatively, based on the authority discussed above, a reasonable officer could believe that it was lawful to arrest Mr. Benny for refusing to obey an order to retreat and cease disrupting the Defendants' performance of their official duties as a crowd of onlookers continued to yell and step towards the officers. Therefore, as an alternative holding, the individual Defendant officers are entitled to qualified immunity with respect to Mr. Benny's First Amendment claim.

Further, to the extent Mr. Benny's false arrest can be construed as retaliation claims under the First Amendment and Section 1983, the Court notes that the existence of probable cause will defeat a First Amendment retaliation claim. *See*, *e.g.*, *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) ("The existence of probable cause . . . will also defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive."); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it] is in reality an unsuccessful attempt to deter or silence criticism of the government."); *Norton v. Town of Islip*, 97 F. Supp. 3d 241, 257 (E.D.N.Y. 2015) ("Even if [plaintiff] had stated a plausible claim against [defendants], the Court would still dismiss [plaintiff] First Amendment retaliation claim because the appearance tickets against [plaintiff] were supported by probable cause."). The Court is unpersuaded that the police retaliated against Mr. Benny for exercising his First Amendment rights. The three videos this Court reviewed make it clear that multiple people, including Mr. Benny, were filming the events occurring around Mr. Benny. None of the other individuals filming were told to stop filming nor were they told that they were under arrest, as

they appeared to stay farther away from the Defendants than Mr. Benny did.  (Exhibit A, 00:46-1:06.)  The Court, therefore, grants Defendants' motion for summary judgment as to Mr. Benny's First Amendment claims.

### V.  THE EQUAL PROTECTION CLAIM (COUNT II)

Lastly, the Court grants summary judgment for Defendants on Mr. Benny's equal protection claim.  A plaintiff can maintain an Equal Protection Clause claim "so long as he establishes that he was treated differently than similarly situated persons and that the unequal treatment he received was motivated by personal animus." *Jackson v. Roslyn Bd. of Educ.*, 438 F.Supp.2d 49, 55 (E.D.N.Y. 2006) (*citing Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494, 500 (2d Cir. 2001)); *see also Brown v. City of Oneonta*, N.Y., 221 F.3d 329, 337 (2d Cir. 2000) ("The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" (citation omitted)).  Mr. Benny has failed to raise a triable issue of material fact with respect to his Equal Protection claim.

Although the Court construes favorably Mr. Benny's sworn declaration for purposes of summary judgment, "the nonmoving party must produce more than a scintilla of admissible evidence that supports the pleadings." *Esmont v. City of New York*, 371 F.Supp.2d 202, 210 (E.D.N.Y.2005); *see also First*

*Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir.2003).  Here, the only evidence Mr. Benny provides for his claims of racially motivated discrimination by Defendants is his own declaration, which presents no specific facts from which a jury could find that the officers were motivated by personal animus.  Mr. Benny claims that Defendants followed Mr. Benny and his friends, who are African-American, rather than other Caucasian pedestrians nearby.  Moreover, Mr. Benny states that Caucasian individuals who were involved in a fight were permitted to leave the scene but provides no facts as to how they were similarly situated to Mr. Benny.  There is no evidence that these Caucasian individuals repeatedly defied direct police orders to "back up" and leave the area; instead, Mr. Benny states that the Caucasian individuals did leave the area.  (Pl. Decl. in Opp'n at ¶ 6.) Accordingly, the Court grants the motion for summary judgment with respect to Mr. Benny's equal protection claim.

## CONCLUSION

For the foregoing reasons, Defendants' summary judgment is GRANTED in part and DENIED in part. The Court GRANTS the Defendants' summary judgment on Mr. Benny's false arrest, malicious prosecution, abuse of process, fabrication of evidence, Equal Protection, and First Amendment claims. The Court DENIES Defendants' summary judgment with respect to Mr. Benny's claims of excessive force and failure to intervene.

Further, the parties are directed to schedule a settlement conference with Magistrate Judge Steven Tiscione and/or complete the remaining discovery in this case.

SO ORDERED.

Dated: Brooklyn, New York
July 27, 2022

    /s/ Kiyo A. Matsumoto
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York